Luvern JORDAN, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 2-1180A373.

Court of Appeals of Indiana, Fourth District.

June 29, 1981.

Rehearing Denied August 18, 1981.

William D. McCarty, Anderson, for appellant (defendant below).

Linley E. Pearson, Atty. Gen. of Indiana, Janis L. Summers, Deputy Atty. Gen., Indianapolis, for appellee (plaintiff below).

MILLER, Judge.

The defendant-appellant Luvern Jordan was convicted of robbery in a trial to the court and was sentenced to imprisonment for a period of ten years. Although on appeal he raises four issues [1] for our review, we find it necessary to discuss only one, since we conclude that although the evidence reveals he stated he committed a robbery, the additional evidence was insufficient to establish he committed *the robbery* charged.

▮ Before reviewing the evidence, we take note of the general rule of law that where questions concerning the sufficiency of evidence are presented on appeal only that evidence which is most favorable to the State, together with all logical and reasonable inference which may be drawn therefrom, will be considered. *Dew v. State,* (1978) 268 Ind. 17, 373 N.E.2d 138, *Lottie v. State,* (1974) 262 Ind. 124, 311 N.E.2d 800. It is not the function of an appellate tribunal either to weigh the evidence, or to determine the credibility of witnesses. *Dew v. State, supra, Lottie v. State, supra, Floyd v. State,* (1980) Ind.App., 399 N.E.2d 449. However, every criminal conviction must be supported by evidence upon each material element of the crime charged, and that evidence must be such as will support the essential conclusions beyond a reasonable doubt. *Lottie v. State, supra, citing Tom v. State,* (1973) 261 Ind. 295, 302 N.E.2d 494, *Spears v. State,* (1970) 253 Ind. 370, 254 N.E.2d 203, *Vuncannon v. State,* (1970) 254 Ind. 206, 258 N.E.2d 639, *Easton v. State,* (1967) 248 Ind. 338, 228 N.E.2d 6, and *Baker v. State,* (1956) 236 Ind. 55, 138 N.E.2d 641.

Turning to the record in the case at bar, we find the evidence most favorable to the State is as follows:

On November 12, 1979 at about 8:30 A.M. Carla Owens was working her regular shift at the Speedway Petroleum station located

---

[1]. Apart from his attack on the sufficiency of the evidence, Jordan argues 1) the State should not have been allowed to submit certain evidence since it allegedly did not properly respond to his notice of alibi; 2) the trial court erred in allowing a witness, Lillie Brown, to testify; and 3) the trial court should have granted his motion to suppress items of physical evidence, namely, a stocking cap and army fatigue jacket, allegedly worn by Jordan.

at 38th and Pendleton Avenue in Anderson, Indiana. As she was counting money she saw a man approach from the lefthand (or west) side of the building, from the direction of Raible Avenue. Claiming to need a gas can, he gave her a five-dollar bill for the deposit and entered the bathroom. On coming out, he asked for two dollars' worth of gas, left the money, then entered the bathroom again. When she turned around Owens saw the man had come out and was leaning over the counter with a gun. He announced that "it was a holdup." Owens stated she handed him her cash drawer, but that the gunman instructed her to "bag it up," and so she reached under the counter for a bank bag. When he also asked for other bank bags which were visible, Owens told him "they're empty." At that point, the gunman noticed additional money which she had under the counter and he came behind the counter and bagged it while she was bagging the money from the cash drawer. At least one of the bags involved was described as a blue, "zipper type" bank bag. Owens gave him $3,200 in small bills. When a customer arrived, the man said "this is not a hold-up" and left, going very rapidly the same way he came, down Raible Avenue and towards the west. Owens told the unidentified customer [2] what happened, asked for change, and phoned the police and her district manager.

At trial, Owens described the gunman as a black man about six feet three inches tall, apparently large in build, and weighing around two hundred pounds. She stated he wore what looked "like a green army coat" and seemed to be wearing a sweatshirt underneath. He also had on a green toboggan hat which was rolled up a little so that it went half way over his ears and above his eyebrows. His eyes were "small, beady eyes," his eyebrows "seemed to be kind of bushy" and he had very large lips. She told

police officers he was bearded, although at trial, when asked if she then ·thought the gunman had a beard she responded, "no, I think that he had a moustache, but I'm not sure."

Significantly, Owens was not able to identify Jordan—either at the trial or before it—as the man who robbed her. At the trial she simply stated, "I can't say for sure." She similarly testified that only three or four hours after the robbery she looked at books of police photographs but was unable to make an identification of anyone because "I was too shook up at the time," although a photo of an individual other than Jordan led her to believe he (the other man) may have committed the robbery. She also stated that within a week after the robbery police brought her about five photographs to look at but she could not then identify the gunman who robbed her. She did however, testify that an army fatigue jacket taken from the defendant when he was arrested was "just like the coat the guy who robbed me was wearing" (though she acknowledged it was not unique in any way) and that a toboggan hat taken from the house where Jordan had been living with one Lillie Brown and her five children was "just like" the one worn by the gunman.[3] A photograph of Jordan taken at the Anderson police station in January of 1980 revealed that at that time he had a moustache and other facial hair which a police officer said "could be classified as a beard, a couple days growth." A police photo of Jordan taken in January of 1977 showed he had a moustache and goatee when that photo was taken.

As in the case of Carla Owens, no other witness at Jordan's trial was able to place him at the robbery scene. One witness, Steve Winkle, who lived a block to the west of the Speedway station on 38th Street did

---

2. This apparently unknown individual was not called as a witness at the trial.

3. She also acknowledged on cross-examination, however, that although the gunman wore a green toboggan hat, the one introduced into evidence was green and yellow. A photo of the hat appearing in the record on appeal reveals a

toboggan hat which is all green when it has apparently been turned inside-out. Owens suggested that at the time of the robbery she was unable to see whether the hat was turned inside-out because "I didn't see the top part of it," where stitching is evident when the hat is turned inside-out.

testify regarding certain "peculiar" activity he had observed, although he indicated he was unable to identify either the car or the person he saw. Winkle testified that early "one morning", about 8:30 A.M., he noticed a "dark" car back up in front of his neighbor's house, out of which a large man emerged wearing dark clothing that looked like a parka or windbreaker and a toboggan hat. Another person remained in the car. Winkle said the man headed east across some railroad tracks in a manner he described as "partly walking and partly jogging." After about ten minutes he returned in the same manner and then, according to Winkle, the two people left in the car, heading east and turning onto Raible Avenue. Winkle said he didn't think there was anything suspicious at the time about what he observed, but that when he read about the Speedway robbery he thought there could be some connection.

Perhaps the most significant witness called by the State was Lillie Brown, who said she was Jordan's girlfriend for six or seven months beginning in June of 1979, and that she had lived with him for a time at her residence at 2702 Horton Drive in Anderson, which is the address where police seized the toboggan hat introduced at trial. She had resided there with her five children. For the most part, the questioning of Brown focused on her written statement supplied to police at their request tending to implicate Brown in a robbery. That statement, the significant parts of which have been emphasized, was as follows:

"I am giving this statement about what I know of an armed robbery on Nov. 12, 1979 that happened at the Speedway Service Station at 38th St. and Pendleton Ave. in Anderson, In. I met and started going with a Luvern Jordan in about June of 1979. *Around the time of the robbery Luvern would come to my mother's house at 935 Arrow Ave. and borrow my car every morning, or maybe every other morning.* He would also keep my car of a night while I was at work. My car is a dark Blue 1978 Chev. Monte Carlo 1979 Lic. Ind. 48A7032. *On one of these mornings Lavern [sic] came to my moth-ers house and got my car about 6:40 A.M. He came back about 9:00 A.M. and came into the house. Lavern [sic] told me There is some money out to the house on Horton Dr. I asked him what he was talking about. Luvern said I did a robbery.* Luvern was by himself when he brought the car back and said this. Luvern left my car at my mothers house and took his own car which was a GTO. *On this d ame [sic] evening I read in Anderson Bulletin where a a robbery had happened at the Speedway Station. Luvern had told me when I asked him what robbery that I would read about it in the paper.* Luvern came back to my mothers house this same evening and we watched television but we didnt [sic] say anything about the robbery. The next morning Luvern called me and asked me if I wanted to go look for the kids bed. I told him to call me back later. Lavern [sic] did call me back later and we decided to go to Muncie to look for the kids bed. When we got into my car at my mothers house to go to Muncie *Lavern [sic] showed me a blue plastic trash bag. There was $600.00 in twenty dollar bills.* I took the money out of the trash bag and put [it] into my billfold. We went to Muncie Value City in Muncie and bought a bedroom suite. I paid the Furniture store the $600.00 cash and owed them $137.00 to be paid upon delivery to my home at 2702 Horton Dr. The furniture co. delivered the furniture to us on Friday 11/16/79 late in the evening. Luvern paid the $137.00 in cash to them out of his billfold. On November the 25, 1979 Luvern and I went to Happy Huggins in Indianapolis to buy a refrigerator. Luvern told me he would buy it. We did buy a refrigerator at Happy Huggins and paid $462.00. Luvern paid them in cash. I do not know what denominatios [sic] the bills were in. Luvern had the money hid in my house at 2702 Horton Dr. but I done [sic] know where in the house. When Luvern would need some money he would just go get it. The reason I was living at my mothers house was because I didnt have any furniture

for the home I bought at 2702 Horton Dr. Luvern did live with me for about two weeks. I put him out last Sunday. On 12/14/79 Luvern came to my mothers house and blocked my car in the driveway with his. We called the Police and Officer Stu Brown came out. Luvern told Officer Brown he wanted to come to Police station and give a statement about a robbery he did and that I was the driver. Luvern did leave with Officer Brown. I would like to say that this statement is true to the best of my knowledge and I will voluntarily consent to take a lie detector test to prove it is true."[4]

■ Under these facts, the inescapable conclusion is that no reasonable inference could be drawn connecting Jordan with the robbery of Carla Owens, since at most the evidence showed only that he had a casual resemblance to the robber, that he owned a commonplace army jacket and had access to a green toboggan hat, and that he had an opportunity to commit the crime charged. The Courts of this State have clearly established, however, that the mere opportunity to commit a crime is insufficient to sustain a conviction, *Lottie v. State, supra*, and that the evidence must do something more than simply tend to establish a suspicion of guilt. *Lottie v. State, supra; Baker v. State, supra; Floyd v. State, supra; Reed v. State*, (1979) Ind.App., 387 N.E.2d 82. "It is not enough that the circumstances be consistent with the hypothesis of guilt," *McAdams v. State*, (1948) 226 Ind. 403, 412, 81 N.E.2d 671, 675, since mere conjecture or surmise by a judge or jury do not properly support such a determination. *Floyd v. State, supra.*

■ As noted above, no witness was able to place Jordan at the robbery scene. Steve Winkle had no recollection of the man he saw, *outside of describing the suspect's* clothing as a windbreaker or parka, and Carla Owens testified only that Jordan could have been the man. In this regard, her identification of Jordan's jacket and the toboggan hat did not tend to establish his guilt since, there was nothing unique about either article. We note it also was not conclusively established the hat had even been worn by Jordan, since it was taken from a house where Lillie Brown had also been living with her five children, and she testified the hat was a small size, similar to ones owned by each of her children, and that she had never seen Jordan wear it. The police did, however, discover the hat in a place where other men's clothes were located. *See Smith v. State*, (1975) 163 Ind.App. 425, 429, 324 N.E.2d 276, 278, where the Court, in reversing a conviction founded on similar facts, observed:

"The evidence neither places him at the scene of the crime, nor connects him with the abandoned automobile in which the stolen money was discovered. The evidence merely shows that Leavell was flushed from his home by tear gas and that in a subsequent search of his apartment a hand gun *similar* to one used in the robbery was found. In our opinion, this evidence together with all reasonable inferences logically flowing therefrom are clearly too remote and speculative to permit Levall's [sic] conviction to stand."

■ It is true, of course, that the written statement of Lillie Brown provided certain circumstantial evidence tending to link Jordan to the commission of *a robbery*. In viewing such evidence, we are aware "it is not the duty or right of this court to reverse simply because we might believe the circumstances do not exclude every reasonable hypothesis of innocence. *Ruetz v. State*, (1978) 268 Ind. 42, 51, 373 N.E.2d 152, 156. However, it is also true, in such instances

---

4. Lillie Brown's in-court account of these events was highly equivocal, however, tending at times both to support and contradict her earlier written statement. Thus, she testified, for example, that everything in the statement was true, and that, by contrast, she had merely invented a story for the police linking Luvern to the money and a blue plastic bag because she thought that is what they wanted to hear. She stated that police had told her the money which was taken was in a blue bag. In this regard, she stated she had been harassed by the police, was afraid of them, and had been coerced into giving the statement by threats of being imprisoned herself and having her children taken away.

involving circumstantial evidence only, that "a reasonable inference of guilt, sufficient to base a conviction upon, must be more that a mere suspicion, conjecture, conclusion, guess, opportunity, or scintilla...." *Id.*

Applying this standard to the instant case, it is evident the State did not meet its evidentiary burden by virtue of Lillie Brown's statement since it only showed he may have had an opportunity to commit the crime charged. Thus, she asserted, with some equivocation in court, that on one day at about 9 A.M., Jordan returned in her "dark" car and told her he "did a robbery" which she would read about "in the paper." Jordan had been gone since 6:40 A.M. On the same day, Lillie Brown noticed in the Anderson *Bulletin* (which was not identified as either a weekly or daily newspaper) the Speedway station had been robbed, although she did not discuss the matter further with Jordan. Jordan did not say he robbed the Speedway station, nor did he apparently state where he had been, and in this regard the record does not show why, if at all, Lillie Brown concluded at that time it was necessarily the Speedway station which Jordan had robbed. Nor is it clear from her statement he committed the robbery while using her car that morning, as opposed to an earlier time (or during the preceding evening) using his car. We simply note what is obvious: namely, that assuming the robbery was committed on November 12, 1979 between 6:40 A.M. and 9:00 A.M., Jordan had time and opportunity to have traveled some distance to commit a robbery[5] (if in fact he did) and that none of the details supplied by Brown showed he necessarily committed a robbery at about 8:30 A.M., or that he was responsible for the Speedway robbery in particular. In fact, the only detail that Lillie Brown did supply—that he showed her $600 in a "blue plastic trash bag" the day after the Speedway robbery—does not connect him with the particular crime charged, since Carla

Owens stated the $3,200 was put in *bank bags*, one of them with a zipper.

While these facts may tend to create a suspicion of guilt, the law in Indiana, as we have observed, is that such evidence alone will not support a conviction, particularly where, as here, the State has shown little more than that the defendant could have committed the crime charged. In *Lottie v. State, supra,* for example, our Supreme Court noted facts similar to those in the case at bar in concluding the defendant's conviction must be reversed. In that case, where the defendant also bore some casual resemblance to the robber, the Court noted evidence that some fifteen minutes before the crime occurred, the defendant, a black man, was only four miles away. The robbery was committed by three black men, one of whom had a toothpick in his mouth, and when the defendant was seen, he also had a toothpick in his mouth, and was accompanied by several other black men. One of the defendant's companions had a shirt which resembled one worn by the robbers. Although a witness at the robbery identified the defendant from a photograph and said it looked like the robber "except for the mouth" the Court concluded, in viewing such circumstantial and inconclusive evidence, that it "boils down to grounds for suspicion only." *Lottie v. State, supra,* 262 Ind. at 128, 311 N.E.2d at 802. The Court stated:

"In this light, can we say that the evidence that the defendant had a toothpick in his mouth twenty minutes earlier and could have traversed the distance from the school to the scene of the crime in the elapsed time, supplies the weight necessary to move the balance from the point of mere suspicion to the point of belief beyond a reasonable doubt?

The evidence tends to support a conclusion of guilt, but it does not rise to the minimum standards set forth in *Baker v. State* (supra), *Easton v. State* (supra),

---

5. The City of Anderson, population of about 65,000, located in Madison County, with a population of 140,000, is within a few minutes' drive of two other metropolitan areas: it is about 15 miles from Muncie (population 77,-000) and about 25 miles from the northeast portion of the City of Indianapolis.

*Vuncannon v. State* (supra), *Spears v. State* (supra), *Tom v. State* (supra)."

*Id.* at 129, 311 N.E.2d at 803. In the instant case, where there was not even a partial identification of the defendant through photographic line-ups, we conclude the similar evidence against Jordan—namely, that he owned or had access to clothing similar to the robber's, that he may have committed a robbery somewhere, and at some time, and that he had access to a "dark" car at approximately the time of the crime in question, does not support his conviction, but rather "boils down to grounds for suspicion only." *Lottie v. State, supra. See also Floyd v. State, supra* at 451, where the Court similarly concluded, in discussing a conviction for leaving the scene of an accident, driving while intoxicated, and driving with a suspended license, that

> "[a]t best, the evidence showed that the defendant was seen six blocks from the accident sometime after its occurrence. He was in an intoxicated state and there was blood on him. He owned a 1969 Rambler. However, the mere suspicion or possibility of guilt is not sufficient to sustain a conviction."

Judgment reversed with instructions to enter a judgment of acquittal.

YOUNG, P. J. and CHIPMAN, J. concur.